IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **KENDALL SMITH**, *Pro Se*, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | *   Civil No. **PJM 11-1301** |
| | * |
| **VERIZON WASHINGTON, D.C. INC.**, | * |
| | * |
| Defendant. | * |

## MEMORANDUM OPINION

Kendall Smith, *pro se*, has sued Verizon Washington, D.C. Inc. ("Verizon"), his former employer, alleging violations of the Civil Rights Act, 42 U.S.C. §§ 1981(a), 2000e, 2000e-2(a), & 2000e-3(a), the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 623, and the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2615(a) & 29 C.F.R. § 825.200(c). Verizon has filed a Motion for Summary Judgment. Paper No. 58. For the following reasons, the Motion is **GRANTED**. Smith's Motion for Leave to File Sur-Reply (Paper No. 78) is **DENIED**.

### I.

Smith, an African-American male over the age of 40, worked for Verizon from November 15, 1999, until his termination on approximately December 18, 2009. He was stationed at Verizon's D.C. Enhanced Variable Rate Codec ("EVRC") Office, which serves as a customer call center.

Throughout 2006 and 2007, Smith was chastised by his supervisors for disciplinary reasons, including misuse of company time and reporting late to work. On October 24, 2007, Smith was placed on final warning status after becoming confrontational with his then-supervisor when he refused to log on to Verizon's instant messaging service. Additionally, Smith was

overheard three times between 2007 and 2008 violating Verizon's company policy by either speaking disparagingly to customers about Verizon or by badgering customers to buy service upgrades. After the third violation, which occurred on November 11, 2008, Smith was suspended for 20 days starting on November 20, 2008, and was given another final warning stating that further discipline could include termination. The suspension was later reduced by 10 days. Smith contends that all of these events were concocted by members of management. On November 21, 2008, Smith filed a complaint with the EEOC against Verizon, the contents of which have not been disclosed to this Court but presumably entailing allegations of race and age discrimination. Paper No. 69 at 4.

In 2008, Smith's Caucasian manager, Tara Russo, allegedly said to him "we're going to get you, [n-word]." This supposedly occurred in the parking garage when no one but Russo and Smith were present. Later, when Smith and Russo were riding the elevator alone together, Russo allegedly mimicked the act of hanging herself. According to Verizon's employment records, Russo was working on a different project during this time period and had not yet met Smith. Smith never reported these alleged actions through any of Verizon's internal EEO complaint avenues.

On April 7, 2009, Supervisor Spurgeon Montgomery asked Smith to come to his office to receive feedback with respect to a customer call, but Smith refused to come without union representation. Montgomery informed Smith that because this meeting was not disciplinary in nature, union representation was not a granted privilege and thus Smith's refusal to come would be deemed insubordination. Smith refused to come and instead went home, claiming stress. This confrontation occurred in the presence of approximately 50 other employees.

Smith claims that during the confrontation with Montgomery, Montgomery verbally threatened him, physically assaulted him, and blocked him from leaving his workspace. Smith also claims that the next day another manager threw a book at Smith's desk in retaliation for his interaction with Montgomery. Smith reported this alleged assault to another supervisor on May 4, 2009, who in turn reported the matter to security. Security told the manager that Smith should report the matter directly to them. Smith, however, refused to report it directly. Even after a security investigator was assigned to the matter, Smith refused to cooperate in the investigation. The investigation was closed in May of 2009, and no action was taken. Smith claims that the associated report was fabricated.

In the middle of June 2009, Montgomery was made Smith's direct supervisor because Smith's then-supervisor went out of the office on pregnancy leave. While Verizon claims that Smith was randomly reassigned to Montgomery, Smith claims that this was a retaliatory move against him for reporting the assault allegedly perpetrated by Montgomery. After Smith filed an internal complaint, and within approximately one month, Smith was reassigned to Carolyn Henderson in July 2009.

In July 2009, Smith was suspended for failing to repay to Verizon tuition loans that Verizon had paid on his behalf as part of the Verizon Tuition Assistance Program ("VZTAP"). VZTAP provides that "failure to timely repay amounts due will result in referral to external collections agencies and may result in disciplinary action up to and including dismissal." Although the record demonstrates that no tuition repayment plan had ever been negotiated, Smith claims that he was making payments of $25 per month and that this too was a pretextual attack against him by management.

On October 15, 2009, Henderson overheard Smith openly disparaging Verizon while on a customer call. During this call, Smith stated to the customer: "[T]hey monitor me often and it would be good to hear that it's not me but the customer who's complaining about Verizon." Smith then encouraged the customer to lodge a complaint against Verizon with "Customer Relations" or the "Public Utility Commission." Eventually, this conduct led to Smith being suspended. Smith claims that the report of this incident was fabricated and that Verizon corporate attorneys and management collaborated in an effort to carry out retribution against him.

On November 5, 2009, through November 7, 2009, Smith was absent from work. In response, the Absence Reporting Center ("ARC"), which handles all FMLA requests for Verizon, automatically sent Smith an FMLA eligibility letter. Smith filled out and submitted the appropriate forms on time, but the ARC apparently misplaced the forms and denied his FMLA request. Smith claims that the ARC purposely lost his papers. (After Smith requested administrative review of his denial, the ARC subsequently reversed its decision and retroactively granted his FMLA leave.)

Meanwhile, on November 10, 2009, Smith was told that because of his alleged October 15 conduct he would be suspended from work for 20 days. Another final written warning accompanied the suspension. Smith claims that while being informed of his suspension, management threatened him with termination and, when he asked to use the restroom, told him to "[j]ust sit there while we deliver what you deserve."

Smith was suspended from November 10, 2009, until December 8, 2009. On November 19, while the suspension was in effect, Smith filed an amended complaint with the EEOC with respect to the suspension, alleging that it was retaliatory in nature and discriminatory as to age

and race. Paper No. 58, Ex. 28 at 3. On December 8, 2009, the last day of his suspension, Henderson, in the company of one other supervisor, visited Smith at his home to hand deliver his Return to Work letter in order to ensure that he knew his Return to Work date. Smith claims that this home visit constituted harassment.

On December 16, 2009, one week after Smith had returned to work, Montgomery found him eating a sandwich at his desk while leaving a customer on hold, both of which actions are explicitly forbidden according to Verizon's Code of Conduct.[1] This incident led to an investigation. During the investigation, Smith refused to answer questions other than stating "[n]o comment." Smith had union representation during this interview. Verizon deemed Smith's failure to cooperate in the investigation a violation of Verizon's Code of Conduct. Smith claims that the investigatory meeting was a sham intended to decrease his productivity. He denies ever eating a sandwich at his desk or having placed a customer on hold.

On December 18, 2009, following the investigatory meeting, the decision was made to terminate Smith's employment. Because Smith was absent from work that day, he was called at his home and informed of his termination. On December 21, 2009, a termination letter was delivered to Smith's home.

On January 11, 2010, though already terminated, Smith filed an application for FMLA leave for the period of December 18, 2009, through January 1, 2010. Unaware that Smith had already been terminated, the ARC approved the FMLA request. Smith claims that because he was granted FMLA leave during these dates, his termination occurred during approved leave and thus constitutes an FMLA violation.

---

[1] December 16, 2009, the day that Smith was alleged to be eating a sandwich while a customer was on hold, was the same day that he emailed Ivan Seidenberg, the then-CEO of Verizon, stating that management had been harassing him and that he was seeking a "win-win" resolution. Paper No. 76, Ex. B at 2 [hereinafter the "win-win" letter].

5

In this suit, Smith seeks compensatory damages for emotional distress; lost wages and bonuses for over two years; lost health care coverage for himself and his children; lost job benefits such as gift cards given to employees; lost 401(k) and pension plan payments; lost future opportunities; loss of reputation; depression; and medical expenses. He also requests that the Court reinstate his job with Verizon but in a different office. Alternatively, Smith seeks equitable severance based on over ten years of employment with reinstatement of health benefits plus punitive damages.

## II.

The Court shall grant summary judgment where there is no dispute over an issue of material fact and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *Estate of Kimmell v. Seven-Up Bottling Co.*, 993 F.2d 410, 412 (4th Cir. 1993). "The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his or her] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alternation in original) (quoting Fed. R. Civ. P. 56(e)). All evidence and reasonable inferences should be drawn in favor of the plaintiff. *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 513 (4th Cir. 2006). However, the court must also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993)) (internal quotation marks omitted) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)). Summary judgment is appropriate where a party fails to make a showing sufficient to establish the elements essential to the party's claim on which the party will bear the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322. There must be sufficient

evidence for a reasonable jury to find for the nonmoving party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 252 (1986), but a "mere scintilla of proof . . . will not suffice to prevent summary judgment." *Peters v. Jenney*, 327 F.3d 307, 314 (4th Cir. 2003).

### III.

Smith claims three violations of the Civil Rights Act, 42 U.S.C. §§ 1981(a), 2000e, 2000e-2(a), & 2000e-3(a), including Racial Discrimination, Retaliation, and Hostile Work Environment; one ADEA violation, 29 U.S.C. § 623; and one FMLA violation, 29 U.S.C. § 2615(a) & 29 C.F.R. § 825.200(c).

### A.

An employer may not discriminate against an individual because of his race with regard to his salary, conditions, or benefits of employment. 42 U.S.C. § 2000e-2(a)(1). To prevail on a claim of race discrimination, the plaintiff must first establish a prima facie case of discrimination. *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). The elements of a prima facie case are that: (1) the employee is part of a protected group; (2) his or her job performance was satisfactory; (3) he or she was the victim of an adverse employment action; and (4) similarly situated employees not in the protected group received more favorable treatment than the employee at issue. *White v. BFI Waste Servs., LLC*, 375 F.3d 288, 295 (4th Cir. 2004). After the plaintiff has established a prima facie case, the burden shifts to the employer to demonstrate a "legitimate, nondiscriminatory reason" for the employee's termination. *Id.* at 253. The employee can demonstrate that the employer's proffered reasons were actually pretext for discrimination by proving that the proffered reasons are incorrect and that discrimination was the real reason for dismissal. *Jiminez v. Mary Washington College*, 57 F.3d 369, 377-78 (4th Cir. 1995). In any case, the discriminatory acts must be committed by an

"actual decisionmaker" who makes "tangible employment decisions" for the employer. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 287, 291 (4th Cir. 2004).

Smith has not established a prima facie case of racial discrimination. Although as an African-American he is a member of a protected group and although his termination is considered an adverse employment action, he has failed to establish that his performance was satisfactory or that similarly situated employees outside his protected group received more favorable treatment than he did. At the time of his termination, Smith had received three final warnings for disciplinary infractions, was under investigation for additional disciplinary infractions, and had knowingly violated Verizon's Code of Conduct by refusing to assist in that investigation. Apart from his own bare assertions, nothing in the record constitutes a factual basis for permitting the conclusion that Smith was a satisfactory employee. Additionally, he has pointed to no one who was similarly situated and of a different race that received more favorable treatment than he did. Moreover, Smith's frequent violations of Verizon's Code of Conduct constituted a "legitimate, nondiscriminatory reason" for his termination, and Smith has in no way shown that Verizon may have acted pretextually. *See White*, 375 F.3d at 295. Because he has completely failed to establish a prima facie case of racial discrimination, summary judgment on this issue must be granted to Verizon.

### B.

An employer is prohibited from retaliating against an employee who has opposed an unlawful or discriminatory practice in the workplace or filed charges, aided in an investigation, or testified in a case concerning an unlawful or discriminatory practice. 42 U.S.C. § 2000e-3(a). A plaintiff lacking direct evidence may prove retaliation by utilizing the burden shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Price v.*

*Thompson*, 380 F.3d 209, 212 (4th Cir. 2004). Under the *McDonnell Douglas* framework, the plaintiff must first establish a prima facie case of retaliation. *Id.* To establish a prima facie case of retaliation, the plaintiff must show that he or she engaged in protected activity, that the employer took adverse action against him or her, and that a causal relationship existed between the protected activity and the adverse employment action. *Id.* To establish a claim for retaliation, the employer must have known of the protected activity and then taken adverse action shortly after the protected activity's discovery. *Id.* at 213. After a prima facie case has been established, the burden shifts to the employer to set forth a legitimate, non-retaliatory explanation for the action. *Id.* at 212. Finally, the plaintiff must prove that the employer's proffered explanation is pretextual; failing that, the claim will fail. *Id.* Importantly, Title VII's bar on retaliation is "not intended to immunize insubordinate, disruptive, or nonproductive behavior at work." *Armstrong v. Index Journal Co.*, 647 F.2d 441, 448 (4th Cir. 1981).

Smith's retaliation arguments fail because he has not established a prima facie case as to any and all of his complaints. While the various EEOC and other administrative complaints he made may have pertained to protected activities and while his suspensions and termination may constitute adverse actions, Smith has failed to establish any causal nexus between the two. Most importantly, he claims his suspensions were retaliatory because he filed EEOC claims, but the fact is that all the suspensions that correlate with Smith's EEOC claims occurred *before* he ever filed the corresponding EEOC claim. Specifically, he was suspended on November 20, 2008, and on November 10, 2009, but he filed his EEOC claims on November 21, 2008, and November 19, 2009. As for a retaliatory nexus between his 2008 EEOC claim and his 2009 suspension and termination, a full year is simply too long a period of time to permit the inference that the 2009 suspension and termination were retaliatory in nature. *See Booth v. Maryland*, 337 F. App'x

301, 310 (4th Cir. 2009) (finding nine months to be too substantial of a passage of time, for retaliatory purposes, to create any causal connection between engaging in a protected activity and an employee's termination).

Additionally, Smith's suggestion that his bathroom time was monitored in retaliation for filing administrative complaints, even if true, fails to establish a prima facie case. Smith has cited no authority to the effect that simply monitoring an employee's use of time during work hours is an adverse action.

In any event, Smith has not demonstrated how Verizon's proffered explanations for any of its actions were in any way pretextual. In regard to Smith being assigned to work with Montgomery, Verizon has offered a legitimate, non-retaliatory explanation, i.e. his then-supervisor had left on maternity leave and all of her employees were randomly reassigned to new supervisors. Smith offers nothing to rebut this explanation. Moreover, when Smith complained about his reassignment to Montgomery and requested a different supervisor, his request was promptly approved and he was reassigned to Henderson. Montgomery had been Smith's direct supervisor for less than a month. Because Smith has offered no evidence to demonstrate that Verizon's placement of employees with different supervisors occurred on anything other than a random basis, he has failed to establish that Verizon's legitimate, non-retaliatory explanation for placing Smith under Montgomery was pretext for retaliation.

Finally, Smith's termination does not constitute retaliation for the "win-win" letter Smith sent to Ivan Seidenberg on December 16, 2009. By December 2009, the time of the letter, Smith had been issued three final warnings. On the same day he sent the "win-win" letter, Smith violated Verizon's Code of Conduct by failing to assist in an investigation that was under way against him. Violating Verizon's Code of Conduct after being issued three final warnings is

most assuredly a legitimate, non-retaliatory reason for terminating an employee. Smith has put forth no evidence attempting to explain this as pretext. Summary judgment on Smith's claim for retaliation must be entered in favor of Verizon.

C.

An employer may not discriminate against an employee in regard to the terms and conditions of his employment because of his or her race. 42 U.S.C. § 2000e-2(a)(1). A successful claim for a racially hostile work environment requires the employee to introduce evidence that: (1) he or she was the victim of unwelcome harassment; (2) the harassment was a direct result of his or her race; (3) "the harassment was sufficiently severe or pervasive to alter the conditions of [] employment and to create an abusive atmosphere"; and (4) the employer may be held liable. *Baqir v. Principi*, 434 F.3d 733, 745-46 (4th Cir. 2006); *Causey v. Balog*, 162 F.3d 795, 801 (4th Cir. 1998). The Court is obliged to consider the totality of the circumstances, including the nature of the harassment, whether it was physical or verbal, and its frequency and severity. *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23 (1993). As a matter of law, the utterance of a single derogatory comment does not significantly alter the work environment. *Id.* at 21. *See Oladokun v. Grafton School, Inc.*, 182 F. Supp. 2d 483, 493 (D. Md. 2002) (granting summary judgment for employer on a claim of hostile work environment where supervisor called plaintiff [n-word] once, though egregious, was not frequent enough to establish a hostile work environment).

With the exception of Russo's alleged use of the n-word,[2] all of Smith's arguments for a hostile work environment fail because he has in no way demonstrated that those actions resulted

---

[2] Smith says that at some later point he encountered Russo on an elevator, and she allegedly mimicked the act of hanging herself. Although in specific context a clear lynch-like gesture might have racial overtones, the reference in this case is to an act (if done) ambiguous in nature, time, and place, and not fairly interpreted as a race-based gesture.

11

from his race. The alleged assault and battery by Montgomery, the visit to Smith's home by Henderson and another, the monitoring of Smith's workspace and bathroom time, the temporary reassignment of Smith to Montgomery's supervision, the suspension of Smith due to his failure to repay his VZTAP loans, and the relocation of Smith's work space to be closer to Montgomery have not in the least been shown to demonstrate discrimination based on race.

Russo's alleged use of the n-word, while clearly race related, is not, as the case law teaches, sufficiently severe or pervasive enough to alter the conditions of Smith's employment and create an abusive atmosphere. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (quoting *Rogers v. E.E.O.C.*, 454 F.2d 234, 238 (5th Cir. 1971)) ("mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" would not effect the conditions of employment to a sufficiently significant degree). However repugnant (if made) the statement may be, the action was an isolated event that was never repeated. A derogatory comment made once in August 2008, is not so severe and pervasive that it creates an abusive work atmosphere for 16 months thereafter. *See Oladokun*, 182 F. Supp. 2d at 494. Summary judgment should be granted in Verizon's favor for all claims relating to a hostile work environment.

### D.

Under the ADEA, an employer may not legally alter the "compensation, terms, conditions, or privileges of employment" or terminate an employee because of the employee's age. 29 U.S.C. § 623(a)(1). To raise an ADEA violation, an employee must plead a claim of disparate treatment or disparate impact. *See Meacham v. Knolls Atomic Power Lab.*, 554 U.S. 84, 92 (2008) (disparate impact); *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 513 (4th Cir. 2006) (disparate treatment).

For a disparate impact claim to prevail, an employee must isolate and identify specific employment practices that are allegedly responsible for any observed statistical age disparity. *Meacham*, 554 U.S. at 100-01. Merely alleging a disparate impact or pointing to a generalized policy that leads to a disparate impact is not enough. *Id.* If an employee meets that burden, then the employer can raise an affirmative defense explaining that the practices were based on reasonable factors other than age. *Id.* at 93-94.

For a disparate treatment claim to prevail, an employee must establish a prima facie case by demonstrating that: (1) he or she is a member of a protected group; (2) his or her qualifications and work performance met the employer's reasonable expectations; (3) he or she was fired; and (4) his or her replacement was substantially younger. *Warch*, 435 F.3d at 513. The burden of production then shifts to the employer to provide a legitimate, non-discriminatory reason for the employee's termination. *Id.* at 513-14. Finally, the employee may rebut the employer's proffered explanation by demonstrating that it was merely pretext for discrimination. *Id.* at 514. Alternatively, an employee may succeed by proving "by a preponderance of the evidence, that age was the but-for cause" of termination. *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 180 (2009) (internal quotation marks omitted).

Both of Smith's ADEA claims fail. The disparate impact claim fails because Smith has not identified a specific employment practice creating any alleged age disparity. Smith alleges that all employees over 40 were offered buyouts while being threatened with proposed lay-offs and terminations. Paper No. 69 at 13. But he has neither submitted any evidence demonstrating such buyouts nor named anyone that took a buyout. Not only would "offering buyouts" constitute a generalized practice under *Meacham* and thus fail to meet the necessary burden to establish a disparate impact under the ADEA, but Smith has failed to offer evidence into the

record that such buyouts actually occurred. Furthermore, in Smith's own deposition he states that the "younger" contract employees were brought in as cheaper employment options to alleviate higher-paid, tenured employees from working overtime. Smith Dep. 146-49. Reducing salary expenses cannot be the basis for an ADEA suit. *See Blistein v. St. John's College*, 860 F. Supp. 256, 265 (1994). For all of the above reasons, Smith's disparate impact claim fails.

Smith's disparate treatment claim fails because his work performance did not meet the employer's reasonable expectations nor has he specifically named a substantially younger replacement worker. Before Smith was terminated, he was on his third final warning, was under investigation by Verizon management for violating Verizon's Code of Conduct, and had knowingly violated Verizon's Code of Conduct by failing to assist in that investigation. Smith has cited no evidence in support of his allegation that his entire disciplinary record was fabricated. Thus, Smith has failed to establish that he met Verizon's reasonable employment expectations. Additionally, Smith has failed to identify a younger employee that replaced him. Because Smith has failed to make a prima facie case for disparate treatment and disparate impact, summary judgment must be awarded in Verizon's favor for all ADEA claims.

E.

An employer may not prevent or interfere with an employee's rights under the FMLA nor retaliate when an employee exercises FMLA rights. 29 U.S.C. § 2615(a); 29 C.F.R. § 825.200(a). Claims for FMLA violations fit into one of two categories: interference or retaliation. *Reed v. Buckeye Fire Equip.*, 241 Fed. Appx. 917, 924 (4th Cir. 2007) (interference); *Cline v. Wal-Mart Stores*, 144 F.3d 294, 301 (4th Cir. 1998) (retaliation). To prevail on an FMLA interference claim, an employee must show that the employer interfered with the exercise of FMLA rights and was caused prejudice because of it. *Ragsdale v. Wolverine World Wide,*

*Inc.*, 535 U.S. 81, 89 (2002). Prejudice exists where an employee loses compensation or benefits as a direct result of the FMLA violation. *Id.* (quoting 29 U.S.C. § 2617(a)(1)(A)(i)(l)) ("The employer is liable only for compensation and benefits lost 'by reason of the violation.'"). To prevail on an FMLA retaliation claim, the same three-part test applicable to retaliation claims applies. *Yashenko v. Harrah's NC Casino Co., LLC*, 446 F.3d 541, 550-51 (4th Cir. 2001). An employee must show that he or she exercised FMLA rights, that the employer took adverse action against him or her, and that the adverse action was causally connected to the employee exercising his or her FMLA rights. *Cline*, 144 F.3d at 301.

Smith fails as to both his interference and retaliation FMLA claims. His interference claim stems from Verizon's initial denial of his FMLA request for the period of November 5 through November 7, 2009. His retaliation claim stems from the fact that he was terminated while on approved FMLA leave during the period of December 18, 2009, through January 1, 2010.

The FMLA interference claim founders because Smith has not demonstrated any prejudice resulting from his initial denial of FMLA benefits from November 5 through November 7, 2009. After appealing the denial and submitting documentation demonstrating that all FMLA forms had been submitted on time to the ARC, the ARC recognized its clerical error and retroactively granted Smith his FMLA benefits for the period of November 5 through November 7, 2009.

Smith fails on his FMLA retaliation claim because he cannot demonstrate a causal link between his FMLA request and his termination. He filed his FMLA request on January 11, 2010, well after he had received his termination of employment notice on December 18, 2009. There is absolutely no suggestion that management, by approving his FMLA referral

retroactively, was attempting to rescind or in fact rescinded Smith's prior termination notice. For there to be a causal link between exercise of FMLA rights and termination, exercise of the rights must precede termination, which did not happen here. Because Smith cannot demonstrate a causal connection between the exercise of his FMLA rights and his termination, his FMLA retaliation claim must fail.

## IV.

For the foregoing reasons, the Court **GRANTS** Defendant's Motion for Summary Judgment (Paper No. 58). Smith's Motion for Leave to File Sur-Reply is **DENIED** (Paper No. 78). Final Judgment will be entered in favor of Verizon and the case will be **CLOSED**.

A separate Order will **ISSUE**.

/s/
_____
**PETER J. MESSITTE
UNITED STATES DISTRICT COURT**

**March 27, 2013**